## Todd and another *against* Hall and others.

The town of *M.*, in *August* 1824, passed a vote, counting upon the advantages to be derived from the establishment of a literary institution within its limits, and, in consideration thereof, and of an interest in the land to be purchased and the buildings to be erected, in proportion to the net avails of the grant, granted to a committee of sundry persons full right and authority, for and in the name and behalf of the town, to enter upon certain stone quarries belonging to the town, personally, or by their agents, and to get out and remove stone therefrom, in such manner and quantities, from time to time, within five years, from the first day of *January* then next, as they might deem necessary to be used in the erection of the buildings, and to defray the expense of getting out and transporting stone, not exceeding in value 10.000 dollars ; and if the quantity of stone thus got out should exceed the quantity used in erecting the buildings and their appurtenances, the excess should, by such committee, be sold, applied and expended in completing the buildings. The town then authorized and directed their agents to make a lease, for said term, in pursuance of the grant, which should vest in the lessee all the right of the town to enter upon the quarries, and get out and remove therefrom stone, and to do any lawful act in relation thereto, during the term, for the purposes specified. In *September*, 1824, the agents of the town, accordingly executed a lease to *L*, one of the committee, which, after counting upon and reciting the vote of the town, demised to him all the right of the town, to enter upon the quarries, &c. [pursuing the terms of the vote.] To have and to hold, use, occupy and improve the premises, with their appurtenances, to him the said *L*, and to his executors, administrators and assigns, for and during said term, and no longer, for the purposes, with the rights and privileges, and subject to the conditions and restrictions in said vote expressed. The committee contracted with *L*, to erect the buildings for the institution, and

New-Haven,
July, 1835.

Todd
v.
Hall.

to complete them by the 4th of *July*, 1825; he to receive certain subscription moneys, from time to time, during the progress of his undertaking, and 3,000 dollars on the complete performance of it. *L* went on to erect the buildings, and contracted with *H* to lease to him all his, *L's* interest, in the quarries, under the vote and lease of the town of *M*, on certain terms, specified in the contract, one of which was, that *H* should furnish the stone to be used in the erection of the buildings, and pay *L*. 10 *per cent*, upon the sales of the stone got out, *L* bearing his proportion of the losses by bad debts. *H* worked the quarries under the contract with *L*, several years; and the sales of stone, during this period, amounted to 42,601 dollars. In 1825, *L*, becoming insolvent, was unable to proceed with his contract. *S*, being appointed for that purpose, and being in possession of the lease, went on with the contract, and completed the buildings under it, receiving, from time to time, moneys due from *H*, as proceeds from the quarries, to the amount of 2,232 dollars. On a *scire-facias*, in a process of foreign attachment, brought, in 1830, by *T*. a creditor of *L*, against *H*, it was held, 1. that under the vote of the town and the lease to *L*, he was authorized to get out and remove stone, not merely sufficient to erect the buildings and pay for the transportation, but sufficient to carry into effect the object of the grant, subject only to the limitation of five years in time, and 10,000 dollars in amount; 2. that *L*, by virtue of the town vote and lease, became legal owner of the interest of the town in the quarries, during the term; 3. that the title of *L* was not forfeited, by his failure to fulfil his contract, by the time stipulated; 4. that the plaintiff, having shewn a legal title in *L*, had made out a *prima facie* case; 5. that the facts disclosed did not shew an equitable interest in *L*, as trustee of the town, sufficient to rebut such *prima facie* case, but, on the contrary, the buildings having been completed, without an advance from any source other than the avails of the quarries under *L's* contract, the town have all that it is entitled to have; 6. that the avails of the quarries remaining in the hands of *L*, were, therefore, in equity, as well as at law, the property of *L*, and liable to be reached, by his creditors, in this process; 7. that the deduction on bad debts was not to be computed on all the debts contracted for the avails of the quarries, which remained uncollected at the time of the service, but on the amount of losses up to the time of trial, happening without the fault of the defendant.

THIS was a *scire-facias* against the defendants, as debtors to *John L. Lewis*, an absconding debtor; to which the general issue was pleaded.

The cause was tried at *New-Haven, January* term, 1835, before *Church*, J.

No question was made on the trial, but that the previous proceedings were proper to charge the defendants, if they were the debtors of *Lewis*, on the 23rd of *November*, 1830, when the copies were left with them in service.

The *American Literary and Scientific Academy* was in-

corporated, in *May,* 1825. At a town meeting of the town of *Middletown,* warned and held on the 2d of *August,* 1824, the inhabitants of that town passed the following vote, for the purposes therein specified :

" *Voted,* that in the opinion of this meeting, it is an object of great importance to the interests of this town to procure the removal of Capt. *Partridge's Scientific and Military Academy* to this place.

" Whereas by virtue of sundry ancient grants of the proprietors of the common and undivided lands in *Middletown* and *Chatham,* and the uniform and uninterrupted usage in pursuance thereof, confirmed and regulated, by recent votes and conveyances, and a resolve of the General Assembly in relation thereto, (as appears of record) said town of *Middletown* has a full, legal and unqualified right to get stone for the general use of said town, and for the particular use of its inhabitants, in either of the town quarries in *Chatham* and *Middletown :* And whereas the removal of Capt. *Partridge's* school to, and its establishment in *Middletown,* will be manifestly advantageous to said town and its inhabitants ; and said town are desirous of promoting the establishment of the same, which cannot be attained, without the aid of the town, by furnishing stone to be taken from said quarries :

" Wherefore it is *resolved,* and the town, in consideration of the premises, and of an interest in the land to be purchased, and the buildings to be erected for the purpose aforesaid, in proportion to the net value of this grant, the evidence of which is to be furnished to the town, by the persons herein-after named, who have been appointed to purchase said land, and erect said buildings, in like manner as to the subscribers for said land and buildings, do hereby grant to said persons herein-after named, full right and authority, for and in the name and behalf of this town, to enter upon said quarries, or either of them, personally or by their agents, and to raise, dig and remove therefrom stone, in such manner and in such quantities, from time to time, within five years from the 1st day of *January* next, as they may deem necessary to be used in the erection of said buildings, and to defray the expense of raising and transporting the stone, not exceeding in value, at the cash price, 10,000 dollars, clear of the expense of raising and transporting the same ; and should the quantity of stone so to be raised within said term, exceed the quantity used in erecting said

buildings and their appurtenances, the excess shall be, by said persons, sold, applied and expended in completing the aforesaid buildings : And the town doth hereby appoint, authorize, empower and direct *Nehemiah Hubbard, Joshua Stow*, and *Alexander Wolcott*, or either of them, for and in behalf of said town, to make, execute and deliver to *Thomas Mather, John Hinsdale, George W. Stanley, Elijah Hubbard, John L. Lewis, John Alsop* and *Samuel D. Hubbard*, the committee herein before referred to, or to such person or persons as they, or a majority of them, shall name, or request a lease or leases for the aforesaid term of five years from said 1st day of *Janury* next, in pursuance of the foregoing vote ; which lease shall vest in the lessee or lessees, all the right of said town to enter into or upon said quarries, and to dig, raise and remove therefrom stone, and to do any lawful act for and in behalf of said town, in relation thereto, during the term and for the purposes aforesaid."

In pursuance of the powers given by this vote, *Nehemiah Hubbard* and others therein named, as agents of the town for that purpose, on the 6th of *September*, 1824, executed and delivered to *Lewis* an instrument in the following words : "To all persons to whom these presents may come, *Greeting :* Whereas the inhabitants of the town of *Middletown*, at a meeting legally warned for the purpose of considering whether it would afford any aid in procuring Capt. *Partridge's* school to be removed to, and established in this town, and making such grant from the town quarries, or otherwise, as the inhabitants might deem proper, and held on the 2d of *August*, 1824, made and passed the following vote, [reciting the above vote.] Now therefore, know ye, that the said town of *Middletown*, by their agents, *Nehemiah Hubbard, Joshua Stow* and *Alexander Wolcott*, all of said *Middletown*, by virtue and in pursuance of the vote herein before recited, for the consideration therein expressed, and by request of the persons therein named, doth demise, grant and to farm let unto *John L. Lewis* of *Middletown* aforesaid, all the right of said town of *Middletown* to enter into and upon the quarries herein before mentioned, and to dig, raise and remove therefrom stone, and to do any lawful act for and in behalf of said town in relation thereto, during the term and for the purposes aforesaid : *To have and to hold*, use, occupy and improve the premises, with all their appurtenances, to him the said *John L. Lewis*, and to his

*New-Haven,*
*July, 1835.*

Todd
*v.*
Hall.

executors, administrators and assigns, for and during the said term of five years from the first day of *January* next, and no longer, for the purposes, with the rights and privileges, and subject to the conditions and restrictions in said vote expressed."

This instrument was duly acknowledged; but was not recorded in the records of the town where the quarries are situated.

On the 4th of *September*, 1824, the committee of the citizens of *Middletown* referred to in said vote, entered into a contract with *Lewis*, in which he agreed to erect the buildings of said *Academy*, in the manner described in such contract, and to complete them, by the 4th of *July*, 1825; in consideration whereof, the committee covenanted with *Lewis* to take the notes of the individual subscribers for the amount of their subscriptions, payable to the committee, or one of them, or their order, in two equal payments, one in *January* and the other in *May* then next, and assign them to *Lewis*, to be by him collected, at his own risk and expense. The notes, or the moneys received on them, were to be delivered to *Lewis*, from time to time, in proportion to his progress in performing his covenants: reserving, however, of such notes or moneys 3000 dollars, to be paid or delivered to *Lewis*, upon his having fully performed his contract, together with the sum of 3500 dollars for the purchase of the land. The committee also covenanted with *Lewis*, to transfer or assign to him, in any proper and legal manner, all the right, title and interest they had, or ought to have, in or to the town quarries, by virtue of the vote of the town of *Middletown*. *Lewis* went on to erect the buildings, and contracted with the defendants to lease to them all his interest in the quarries under said vote and lease from the agents of the town of *Middletown* to him, on the following terms, (as claimed to be proved by the defendants) *viz.* that the defendants, who were then, and for many years had been, extensively engaged in working their own quarries adjacent to those of the towns of *Middletown* and *Chatham*, and in disposing of the produce thereof, in various parts of the *United States*, on credit, should manage the interest leased or confided to *Lewis* in connexion with their own concerns, and in the same manner as they conducted them; that they should furnish the stone to be used in the erection of said buildings, and pay to *Lewis* (including, as a part thereof, the stone they might so furnish,)

New-Haven,
July, 1835.

Todd
v.
Hall.

ten *per cent.* upon the sales of the stone got out, as well by the defendants under said lease or grant from the town of *Middletown*, as by the lessees of the undivided moiety of the quarries owned by the town of *Chatham; Lewis* to bear a proportional part with the defendants of all losses by bad debts. It was also agreed between the defendants and *Lewis*, that their own subscription of 900 dollars should be credited in their account with him.

*Lewis* did not complete his contract by the time or in the manner specified, but having become deeply insolvent and destitute of credit, he was unable to proceed therewith. The committee having advanced to him all that he was entitled to, under the contract, and declining to make further advances, in the month of *August*, 1825, *Samuel D. Hubbard*, treasurer of the corporation, was appointed to complete the buildings; which he accordingly did, after the abandonment thereof by *Lewis*. Being in possession of the lease, *Hubbard* received, from time to time, the moneys due from the defendants from the proceeds of the quarries, to the amount of 2,232 dollars; of which sum 900 dollars was received *April* 10th, 1828, and the residue, in the years 1826 and 1827. All these payments were admitted, by the plaintiffs, to have been properly made, by the defendants, with the assent of *Lewis*.

The defendants worked the quarries, during the years 1825, 6, 7, 8, 9, in connexion with *E.* and *S. Brainerd*, who were the lessees of the undivided interest of the town of *Chatham* therein. The whole of the sales, during this period, amounted to 42,601 dollars, 70 cents; for ten *per cent.* of which, *viz.* 4,260 dollars, 17 cents, the plaintiffs claimed the defendants were chargeable on their contract with *Lewis*. Of said sum of 42,601 dollars, 70 cents, there remained uncollected, on the 23d of *November*, 1830, when the copies were left in service with the defendants, of the sales made by the defendants, 4,985 dollars, 92 cents, and of the sales by *E.* and *S. Brainerd*, upwards of 6000 dollars; of which sums a part has since been received by the defendants. And the defendants introduced testimony to prove, and claimed that they had proved, that of the sums still remaining due, upwards of 4000 dollars were uncollectable and wholly lost, without their fault; and they claimed, that they were entitled to charge 10 *per cent.* of the losses, or at least 300 dollars thereof, to *Lewis;* and that this

should be allowed to them, and be deducted from said sum of 4,260 dollars, 17 cents.

All the stone used in the erection of the buildings were furnished, by the defendants, in the years 1825 and 1826, and amounted to the sum of 2338 dollars, 87 cents; all of which, it was admitted, were chargeable, by the defendants, towards the payment of said 10 *per cent.* and their subscription, except to the amount of 830 dollars, 15 cents, which, the plaintiffs claimed, were sold, by the defendants, to one *Gillum*, and by him to *Lewis*. The defendants claimed, that said stone were sold by them to *Lewis* and delivered to *Gillum* by them, by *Lewis's* directions and on his credit. They therefore claimed, that that amount also was chargeable to the same account. Testimony was exhibited, by the parties, in support of their respective claims; and this constituted the principal question of fact in the case.

In *February*, 1832, *Merritt Ward* recovered judgment against the defendants for 289 dollars, 30 cents, as the debtors of *Lewis*, on a *scire-facias* against them, as garnishees, by virtue of an attachment prior to that of the plaintiffs; and it was admitted, by the plaintiffs, that if the above-mentioned charge of 830 dollars, 15 cents, for stone, was allowed to the defendants, in addition to said sum of 289 dollars, 30 cents, recovered by *Ward*, and 300 dollars, part only of the amount claimed by the defendants as uncollected, nothing would remain in their hands subject to the lien of the plaintiffs. And thereupon the defendants insisted, that the court ought to charge the jury, That upon the facts claimed and admitted, *Lewis* never had such a personal interest in the sums payable by the defendants from the proceeds of the quarries as his creditors could attach under the process of foreign attachment, but a mere trust or agency under the vote of the town of *Middletown*, which ceased on his abandonment of his contract in *August*, 1825: That if *Lewis* ever had any personal interest in the proceeds or rent of the quarries, it did not continue after his failure to fulfil his contract: That the vote of the town of *Middletown* conferred no authority to dig and remove stone from the quarries, within the period specified therein, in greater quantities than the committee should deem necessary to be used in the erection of the buildings, and to defray the expense of raising and transporting the stone; and if the jury should find,

that a quantity more than sufficient for these purposes had been dug and removed, and applied to such purposes, by the 10th of *April*, 1828, all power, agency and interest of *Lewis* then ceased (if he had any before) in relation to the quarries; and the defendants, for the future proceeds, were not accountable to him : That if the jury should find the contract of the defendants with *Lewis* to be as claimed by them, and if they were accountable at all to *Lewis* for the proceeds of the quarries, the jury, in ascertaining whether the defendants were indebted at the time the copies were left in service with them, should deduct from said sum of 4260 dollars, 17 cents, 10 *per cent.* on all the debts contracted for the proceeds of the quarries, which remained uncollected, on the 23d of *November*, 1830 : That the court should instruct the jury, that inasmuch as it was admitted, that the defendants, if chargeable at all, as the debtors of *Lewis*, were chargeable, at the time of the prior attachment of *Ward*, with the whole amount now claimed by the plaintiffs to have been due at the time of their attachment, the judgment recovered by *Ward*, on his *scire-facias*, was a protection to the defendants against the demand of the plaintiffs.

The court charged the jury, 1. That upon the facts claimed and admitted by the parties, *Lewis* had such a personal interest in the sums payable by the defendants from the proceeds of the quarries, as that his creditors could attach them, by process of foreign attachment : 2. That if *Lewis* failed to fulfil his contract with the committee at the period claimed by the defendants, *that* did not thenceforth destroy the personal interest in the proceeds or rent of the quarries, as claimed by the defendants : 3. That the vote of the town of *Middletown* conferred authority to dig and remove stone from the quarries within the period specified therein in greater quantities than the committee therein named should deem necessary to be used in the erection of the buildings, and to defray the expense of raising and transporting the stone ; and that, although the jury should be of opinion, that a quantity of stone more than sufficient for these purposes had been dug, removed and applied for such purposes, by the 10th of *April*, 1828, yet the interest and agency of *Lewis*, in relation to the quarries, did not, therefore, cease ; and the defendants still continued accountable to *Lewis* for the future proceeds of the quarries, unless the jury

*New-Haven,*
*July, 1835.*

Todd.
*v.*
Hall.

should find, that *Lewis* had assigned to the town of *Middle-town,* to said corporation, or to said committee, all his interest in the lease, and in the contract made by him with the defendants; in which case, the defendants would not, after such assignment, be any longer liable to *Lewis :* 4. That if the jury should find the contract made by the defendants with *Lewis,* as claimed by the defendants, and that they were accountable to *Lewis* for the proceeds of the quarries, it would not be the duty of the jury, for the purpose of ascertaining whether the defendants were indebted to *Lewis,* when the copies were left in service, to deduct from said sum of 4260 dollars, 17 cents, 10 *per cent.* on all *the debts contracted,* for the proceeds of the quarries, and which remained uncollected, on the 23d of *November,* 1830; but that the jury ought to deduct 10 *per cent.* on the amount of *losses,* up to the present time, sustained by reason of bad and uncollectable debts, arising out of debts contracted for the proceeds of the quarries, without the fault of the defendants : 5. That the judgment recovered by *Ward* against the defendants of 289 dollars, 30 cents, was no protection to the defendants against the claim of the plaintiffs, except for that amount, which it would be the duty of the jury to deduct from said sum of 4260 dollars, 17 cents.

The jury returned a verdict for the plaintiffs; and the defendants moved for a new trial for a mis-direction.

*Sherman* and *R. S. Baldwin,* in support of the motion, contended, 1. That *Lewis,* by virtue of the town vote and the lease to him, was only authorized to get out stone sufficient to erect the buildings and pay for the transportation ; and that this authority was limited as to time and amount.   The vote of the town was in effect its subscription for the academic buildings; and if the form and dimensions of the buildings had been fixed, the value of the subscription would then have been ascertained, and measured, by the cost of the stone necessary to be used in their erection.   But as the quantity necessary to be used was unknown, the town authorized the building committee, for and in behalf of the town, to get out stone, in such quantities, as they should deem necessary to be used, &c. ; the value to be ascertained by them, and a proportional interest in the buildings secured to the town.   A special confidence was reposed in them ; and they and their appointee

New-Haven,
July, 1835.

Todd
v.
Hall.

were constituted agents for the town, with limited powers, to be exercised within a limited time. If, through error in judgment, more stone should be raised than was necessary to be used, it was provided, that they should be sold and applied, by the com mittee, to the completion of the buildings; so that the town should have an interest in the property in proportion, &c. It was further provided, that a lease should be executed, conferring on the committee, or their appointee, " all the rights of the town to enter upon and dig, raise and remove stone, and do any lawful act, for and in behalf of the town, in relation thereto, during said term, and for the purposes aforesaid." In every part of the vote, the powers are limited to the *specified purposes*. It was not, therefore, a personal interest in the committee; nor had they authority to vest in any *assignee* the power of getting out stone for his own use, at his pleasure, without reference to the quantity necessary to be used in the buildings. On *Lewis's* failure and abandonment, it became the duty of the committee to get out and apply the stone, or the proceeds thereof, to the *necessary amount*; after which, it would seem to follow, that all interest or power under the vote was at an end. The committee, in the building contract, covenanted to assign to *Lewis* all the right or interest they had in the quarries under the town vote. And *Lewis* leased to and contracted with the defendants, to manage *all his interest* under the town vote and lease from the agents. If, therefore, the defendants continued to work the quarries, after the power conferred by the town vote was exhausted, and consequently, after *Lewis's* interest under it had ceased, they were accountable to the town, and not to him. We claim, therefore, that the jury should have been instructed on these points, as was claimed by the defendants.

2. That the court erred in charging the jury, that the defendants were liable, at the time the copies were left in service, as debtors of *Lewis*, for the proceeds of the quarries, then uncollected; as well of sales by *E.* and *S. Brainerd*, as by the defendants. They were to manage *Lewis's* interest as their own. It was expected they were to sell *on credit*. The outstanding debts belonged to the defendants, and to such other persons as were entitled under the contract, in the proportion of ninety to ten. They were *agents* in the collection; and even if culpa-

New-Haven,
July, 1835.

Todd
v.
Hall.

bly negligent, they did not thereby become *debtors*. See 5 *Conn. Rep.* 118.   2 *Kent's Com.* 485.

3. That *Ward's* judgment was conclusive. [Not much insisted on.]

*Kimberly* and *Storrs*, contra, contended, 1. That by the terms of the grant, the grantee acquired a personal and absolute interest in the quarries, to raise and remove stone, and to sell the same, and in the moneys received and debts due for the avails.   The grant recites the origin, nature and extent of the right of the town in the quarries; declares it to be "a full, legal and unqualified right;" states an ample consideration, as well direct and pecuniary, as incidental, for the grant; grants " all the right of the town in the quarries," and "full right and authority, for and in the name and behalf of the town," to enter, &c. and "to dig, raise and remove stone;" with power to sell, to pay expenses; also, " to sell, after taking what shall be used in erecting said building," &c.   The phrase, "in the name and behalf of the town," does not purport to limit or qualify the grant; but is intended to vest in the grantee a right to stand in the place of the town as its representative; and to use its name and exercise its authority, for the purposes, and in the manner specified in the grant.   If there is a condition annexed to this grant, it is implied in the direct part of the consideration, *viz.* the purchase of the land and the erection of the buildings; and is necessarily a condition subsequent.   7 *Conn. Rep.* 45.

This condition has been fully complied with, principally by *Lewis,* and in part by the committee, under him, and with his assent.   The town, by such compliance, and by the terms of the grant, now hold, as tenants in common, with the other subscribers, an interest in the land and buildings equal to the net avails of the quarry, *viz.* about 4000 dollars.   The grant, as to duration, is limited to five years; and as to the value of the stone to be taken, to 10,000 dollars, clear of expense; and provides for the application of the surplus which would remain, after stone sufficient for the erection of the buildings should have been taken.

By the terms of the grant, the stone must be taken, by *Lewis,* and sold, before the condition could be complied with; and the town reserves no lien on the property granted, much

less, on the debts due, or money received for stone sold. Of course, *Lewis's* interest is personal and unconditional. Whatever right the town might have against *Lewis*, in case the condition had not been complied with, the defendants, as against *Lewis* or his creditors, can have no right to retain the money, for their own benefit ; and they do not make the claim by authority of the town.

New-Haven
July, 1835.

Todd
*v.*
Hall.

The practice of the town, of the corporation, and its committee, of *Lewis*, and of the defendants, has been in exact conformity with this construction. The land has been purchased ; the buildings have been erected ; the avails of the quarry, so far as required, by the committee, or by *Lewis*, have been paid over, by the defendants, and applied. The consideration of the grant has been fully satisfied ; and the corporation and committee have realized their expected advantages, and neither has any claim. The only thing remaining to be done, relating to the grant, is, to adjust the account between the defendants and *Lewis*, or those entitled to his rights ; and to pay over the balance.

This construction of the grant is confirmed, by the manifest injustice of the construction claimed by the defendants. First, as respects the town—after having received the full value of the grant, in the land and buildings, and for a consideration less than half the sum authorized to be taken, they can claim the balance in the defendants' hands, and recover from them and from the corporation, all which the corporation has received and expended. Secondly, as respects the corporation—if the grant was forfeited and became void, by *Lewis's* failure, in *August*, 1825, they would be liable for moneys subsequently received and applied under its provisions. Thirdly, as respects *Lewis*—so far as benefit or advantage under the grant might be claimed, he is merely an agent, and has no interest ; but with regard to expenses, loss, and liability incurred by him, under the same grant, he is principal. Were he living, he would be personally liable to the corporation, for his failure to fulfil his contract with the building committee. Fourthly, as respects the defendants—they can hold the money against the corporation and committee ; and have, at least, a plausible defence against the town, *viz.* that they have received all the benefit under the grant, which they expected, or ought in justice to

have ; and will soon have, in the statute of limitations, a perfect defence against *Lewis* and his creditors.

2. That the plaintiffs, by leaving copies, acquired a lien on debts then due, and collected since that time, or remaining uncollected at the trial, excepting only such as were lost, without the fault of the defendants. The defendants were indebted to *Lewis*, for his proportion of all sales, as soon as made ; and were liable to pay, as soon as the debts were, or, by the use of due diligence, might have been, collected. *Frothingham* v. *Haley* & al. 3 *Mass. Rep.* 68. The statute of Foreign Attachment, *sect.* 5. protects the garnishee against execution, but not against judgment, when the debt has become payable. But where the debt has become payable, but is only not collected, the garnishee is liable to judgment and execution. As the agreement between *Lewis* and the defendants does not purport to subject him to losses incurred by the fault of the defendants ; the charge, as far as it respects bad debts, is correct. But as the 830 dollars, 15 cents, with interest, found by the jury, to remain in the hands of the defendants, is sufficient to sustain the verdict, and is not claimed to be a bad debt, the amount of bad debts is immaterial.

3. That *Ward's* recovery against the defendants is a protection no farther than the sum paid. In the first place, the judgments are not between the same parties. Secondly, both judgments are presumed to be right, according to the evidence on which they were given. Thirdly, it does not appear, that the disclosures of the defendants, and the evidence adduced, proved as great a balance, in the former case, as in this. Fourthly, for aught which appears on the motion, debts then deemed bad, may have been since collected or secured. Fifthly, it does not appear, that *Ward* claimed a greater sum than he recovered.

WILLIAMS, Ch. J. The right of the plaintiffs to recover in this *scire-facias*, depends upon the question, what interest had *John L. Lewis* in the stone quarries, under the lease derived from the town of *Middletown?* And as the authority of the committee who gave the lease, is founded upon the vote of the town, it becomes important to examine that vote, as well as the lease.

It has been contended, that *Lewis* did not acquire either a legal or an equitable interest under that lease.

The town vote, after counting upon the advantages to be derived from the *Military Academy* of Capt. *Partridge*, in consideration thereof, and of an interest in the lands to be purchased, and the buildings to be erected, in proportion to the net avails of the grant, granted to *Nehemiah Hubbard* and others, full right and authority. for and in the name and behalf of the town, to enter upon said quarries, personally, or by their agents, and to raise, dig and remove stone therefrom, in such manner and quantities, from time to time, within five years from the 1st of *January* then next, as they might deem necessary to be used in the erection of said buildings, and to defray the expense of raising and transporting the stone, not exceeding in value, at the cash price, 10,000 dollars; and if the quantity thus raised should exceed the quantity used in erecting said buildings and their appurtenances, the excess should, by said persons, be sold, applied and expended in completing the aforesaid buildings. And the committee were authorized to make a lease or leases, for said term, in pursuance of the foregoing vote, which should vest in the lessee all the right of said town to enter into or upon said quarries, and to dig, raise and remove therefrom stone, and to do any lawful act for and in behalf of said town, and in relation thereto, during the term, and for the purpose aforesaid. What were the powers of the committee under this vote?

On the one side, it was contended, that they were authorized to raise stone sufficient to erect the buildings and pay for the transportation; on the other, that they were authorized to raise such quantity of stone as in their opinion was necessary to carry into effect the object of the grant, provided it was done within five years, and did not exceed 10,000 dollars.

In support of the first construction, the defendants claim, that the power is expressly limited to the stone to be used in the *erection* of their buildings, and the expenses of raising and transporting them, and that even for this purpose, they could not proceed after five years, nor beyond 10,000 dollars : That this is the grammatical construction of the vote; to confirm which, they say, there is no stop after the word " necessary," in an instrument wherein there is a peculiar accuracy in the punctuation. The plaintiffs claim, that if this deed is read, as they suppose it was intended, with a stop after the word " ne-

*New-Haven,*
*July, 1835.*

Todd
*v.*
Hall.

cessary," all difficulty will be removed: That the committee are to procure stone, in such manner and quantity as they shall deem necessary, to carry into effect the object in view; and that their power is only limited by five years, and 10,000 dollars; and that the court will look rather to the general intent and object, than rely upon any inference drawn from the pointing of a sentence.

The last is, in the opinion of the court, the true construction of this vote. Any other would leave no discretion at all to the committee. No discretion was required to determine the stone necessary, after deducting the labour and transportation. It could be determined readily, by the fact what stone were placed in the buildings, with the calculation which every one could make, how many more would pay for the raising and transportation of them. It can hardly be believed, that a committee was raised, and a power to lease given, if nothing more was intended. This committee were empowered to enter upon the land, and take stone, in such manner and such quantity, from time to time, as *they might deem* necessary in the erection of said buildings, and defray the expense of raising and transporting them; and if more were raised, in the time limited, than was required for the erection of said buildings and appurtenances, then the excess was, by said committee, to be applied and expended in completing the aforesaid buildings.

What stronger language could be used to show what was intended by the vote, taking it together? Stone were to be raised to *erect* the buildings; a committee was appointed to see that the necessary stone were raised; and they are expressly directed, that the excess of stone " *so to be raised,*"—that is, by virtue of the authority here granted, within the time and the amount limited,—shall be by them applied to the completing of the buildings. And can it then be doubted, that it was contemplated, that under the power to raise stone to the amount of 10,000 dollars, they should not be confined to raising enough for the walls of the buildings, when a provision is expressly made to appropriate the avails of the stone raised, beyond those necessary to place in the buildings towards completing them? It seems to the court, there can be no doubt as to the true construction of this vote. An object, which was then thought to be important, was in view. A military academy was to be located there. That could not be expected, un-

New-Haven,
July, 1835.
———
Todd
v.
Hall.

less buildings were prepared ; and the erection of the buildings must depend upon voluntary subscriptions.    What sum might be drawn from individuals, could not be precisely known.    The design, however, must be accomplished.    The town, therefore, instead of granting a sum certain, vote to appoint a committee to procure from the stone quarries of the town, stone enough to erect and complete the buildings ; or, at least, to procure so many, as in their judgment would effect that purpose, provided that it should not exceed 10,000 dollars, and should be taken within five years.    If with the private subscriptions, proper buildings could, in the judgment of the committee, be completed, with 5,000 dollars from the town, then they would raise that sum from the quarries ; but if they found it necessary, they might go to 10,000 dollars.

The vote also directs, that a lease be made to the committee, or such persons as they should direct, for five years ; which lease should vest in the lessee all the right of said town to enter into and upon said quarries, and to dig, raise and remove therefrom stone, and to do any lawful act in relation thereto, during the term, *for the purpose* aforesaid.    What purpose ?    To the *erection* of the buildings and applying the avails beyond what was so used in completing them, not exceeding, however, 10,000 dollars.

When the object is thus apparent, and the duty thus clearly pointed out, it cannot be defeated, by the pointing of a sentence, or even the grammatical construction.    When the intent of the parties to a contract is clearly discovered, it must controul, unless the language is decisively against it.    Under this vote, then, the committee were authorized to lease the quarries for five years, and to raise 10,000 dollars.

But it is said, that the legal ownership remained in the town, and not in the lessee.    It is not objected but that the lease is in pursuance of the vote.    That vote, after directing that a lease might be made, proceeds as follows : " Which lease shall vest in the lessee all the rights of said town to enter into and upon said quarries, and to raise and remove therefrom, stone, &c., and do any other lawful act for and in behalf of said town, in relation thereto, during the term and for the purposes aforesaid."  A lease founded upon this vote, must give a perfect right of entry and possession, for five years, with a right to do the acts that the town might do, in relation to this subject.    The party

must have a right to maintain trespass and ejectment against a stranger, or even an agent of the town. *Lewis*, then, by virtue of this vote and lease, became the legal owner, during the term. Indeed, this was admitted, by the counsel who closed the case for the defendants.

It is said, that if *Lewis* had the title, he forfeited it, when he failed to fulfil his contract and abandoned it. If *Lewis* had a vested interest in this quarry, by virtue of his lease, it may well be doubted whether there could be a forfeiture, because he failed to perform on his part. However that may be, a third person, and that person his lessee, cannot set up this claim, without shewing also, that the forfeiture has been claimed, by the party interested.

It is also said, that *Lewis*, having an equitable interest, was merely a lessee for the town, and that this process cannot be used to draw from him money, which does not equitably, as well as legally, belong to him: that the creditors of an absconding debtor cannot thus draw trust money from his hands. This principle is certainly correct, and the defendants must have the benefit of it. But when their counsel go further, and claim, that the plaintiffs are bound to show, that the absconding debtor has an equitable as well as a legal interest in the property in question, it is a proposition which cannot be admitted. It is an ingenious attempt to cast the burthen of proof from themselves upon the other party. The rule is this: If the plaintiff shews a title to the property in the absconding debtor, he makes out a *prima facie* case, unless his proof shows, that this title is a mere equitable one.

But the defendants will be permitted to rebut this *prima facie* case, by showing, that the interest of the absconding debtor is merely an equitable one; and whenever he claims such an equity to exist, he must shew it. Suppose the town of *Middletown* were to interpose these equitable claims to this property, must they not shew it? And can these defendants, who claim only by virtue of their title, be required to do less than they must have done? If so, then they might defend themselves under a supposed equity in the town of *Middletown*, which the town could never establish, and then hold this money against the creditors of *John L. Lewis*, or be obliged to pay it over to *Lewis*, after the town of *Middletown* had failed of a recovery, and after it was too late for the attaching creditors to hold.

*New-Haven,*
July, 1835.

Todd
*v.*
Hall.

Is it then shewn to the court, that *Lewis* had only an equitable interest in this quarry, or the avails of it ? If the fact is so, it is a little remarkable, that the town should not have come and asked the interposition of the court, to stay proceedings so injurious to them, and obtain a more minute disclosure of the facts, which tended to show their interest. Or, if the defendants believed this, and had not all the evidence, they might, by a bill of interpleader, have brought all the facts before the court. As they have chosen to rely upon the facts here disclosed, we will examine them, and see whether this part of the defence is supported.

In the first place, it is claimed, that the vote and lease show that *Lewis* was a mere trustee for the town. Now, the lease is a lease of all the right of the town to enter upon the quarries, to dig, raise and remove therefrom stone : to have and to hold, use, occupy and improve the premises, &c., to him and his heirs, executors and assigns, for the term of five years. These are apt and proper words, certainly, to convey an interest. It is added, however, after the clause relative to the digging stone, " and do any lawful act, for or in behalf of said town ;" and the lease counts upon and recites the vote of the town.

That vote, in consideration of the interest which the town has in the establishment of this school, and the land to be purchased, and the buildings to be erected, grants to certain persons full right and authority, for, and in the name and behalf of said town, to enter upon said quarries, personally, or by their agents, and to raise, dig and remove therefrom stone, &c. The vote then proceeds to authorize a lease to be made, which shall vest in the lessee all the right of the town to enter into said quarries, and dig, raise and remove stone therefrom, and do any lawful act, for and in behalf of said town, in relation thereto. That the committee had right, under this vote, to lease this quarry and demise a real interest therein, for five years, and to raise 10,000 dollars, cannot be doubted. The vote is not, that this is to be done for the *use* of the town, but *for and in behalf* of the town. The words, perhaps, would not be important, if the intent was clear ; but the words, " for and in behalf of the town," would rather import an *agency* than a *trust*. But when an interest is thus clearly granted, it is not consistent with it to consider this an agency. Nor is it very easy to dis-

cover why any lease should be given at all, if the object was to create an agency, or even a trust.

But if this was a trust, what was the nature of it? It was, that the lessee might, within five years, raise 10,000 dollars from these quarries, to be expended in erecting and completing the buildings for *The American Literary and Scientific Academy.* If the contractor did erect and complete, or cause to be erected and completed, these buildings, he was entitled to the 10,000 dollars, out of the avails of these quarries, if the committee chose to raise that sum out of them. This they have done ; and *Lewis* was authorized to raise this sum from them within five years ; and the ground has been purchased and the buildings erected. What interest, then, has the town of *Middletown* in the 10,000 dollars, to be raised from these quarries within the five years?

It does not seem to be denied, that if *Lewis* had gone on and finished the buildings himself, the town could not have had any equity whatever. But it is claimed, that *Lewis* became bankrupt, and having received the moneys, which, under the contract, he was entitled to receive, and the committee declining to make him further advances, *Samuel D. Hubbard* was appointed to complete said buildings, which he did, and being in possession of said lease, he did, with the assent of *Lewis*, receive from the defendants 2,232 dollars, the avails of said quarries.

Now, what was the contract of *Lewis* with the committee? He agreed to erect and complete the buildings, by the 4th of *July*, 1825. They agreed to assign him the notes of the subscribers, or the avails thereof, in proportion to his progress in the buildings, reserving, however, 3,000 dollars, to be paid upon their completion, with 3,500 dollars for the purchase of the land, and to assign to him the interest in the quarries, which they had by the town vote, under which *Lewis* received and leased the same to the defendants. It is said, that *Lewis* thus *abandoned* the contract ; and of course, his interest in the quarry ceased. We are now to suppose, that if he had completed his contract, he would have been entitled to the whole avails of his contract under this lease, and the 3,000 dollars reserved until it was completed. *Hubbard* went on and completed it, and with the assent of *Lewis*, received from the

New-Haven, July, 1835.

Todd
v.
Hall.

avails of the contract 2,232 dollars ; and there is no evidence whatever before this Court, that he advanced one cent from his own funds, or from the treasury of the corporation.

How, then, can the town of *Middletown* claim the avails of these quarries ? For aught that appears, *Lewis* has invested every cent received by himself or *Hubbard* from these quarries, in the lands and buildings which are now completed ; and the town have all that they were entitled to have. The buildings were not indeed completed at the day ; but it cannot be claimed, in a court of chancery, that this fact revested all the interest in the town, or was, in itself, an abandonment of the contract. Nor is it sufficient evidence that *Lewis* abandoned the contract, because he assented that *Hubbard* should receive the rents of the quarries, while he was finishing the buildings ; or that he told the defendants he had given up the lease to *Hubbard.* That might, indeed, justify the defendants in making payment to *Hubbard ;* but it would not show, that *Lewis* had abandoned the contract. It seems rather, as the committee had a right, notwithstanding this lease, to keep back 3,000 dollars, that when *Lewis assented*, that these funds should be, by *Hubbard*, applied to this purpose, his object was to fulfil the contract, in the only way in which it was in his power to do it ; and that upon the facts shown to the court, there was no intention to abandon it.

Something, indeed, is said in the motion, from which it may be claimed, that it is found he abandoned it. It is said, that " he became deeply insolvent and unable to proceed with the contract ; the committee having advanced to him all that he was entitled to, under said contract, and declining to make further advances, *Samuel D. Hubbard* was appointed, in *August,* 1825, treasurer of the corporation, and also was appointed to complete said buildings, which he accordingly did, *after the abandonment thereof,* by said *Lewis* as aforesaid ; and said *Hubbard* being in possession of said lease, received from the defendant," &c. This only brings us back to the question whether his insolvency and inability to perform his contract, with his delivery of the lease to *Hubbard,* was an abandonment of it. That he assented to *Hubbard's* finishing the buildings, may be fairly inferred ; but that he meant also to give up the 3000 dollars reserved by the committee, until the buildings were completed and the avails of the quarries,

*New-Haven,*
*July, 1835.*

Todd
*v.*
Hall.

both of which he was entitled to, upon their completion, cannot be inferred. The fair inference is, that both parties were willing that the contract should be completed, from the avails of the funds designated therefor ; and when that was done, unless some claim for damages was made, these funds remained in equity, as well as at law, the property of *Lewis.* The fact, then, appearing, that the buildings were completed, though not exactly by the time, and that there were funds remaining, the avails of the quarries, in the hands of the defendants, there is no reason why these funds should not be made available to the creditors of *Lewis.* No reason is shewn, why the town of *Middletown* should have any controul over them. They authorized the committee to part with them, for certain purposes. Those purposes had been acccomplished, without the aid of any other funds from the town or the individual who executed it ; and the town have made no claim for damages arising from the omission to complete them at the time. If, therefore, it is admitted, as the defendants claimed, that these stone could not, in the progress of these buildings, have been attached and taken away to pay the debts of *Lewis,* it by no means follows, that these defendants can now set up an equitable claim in the town of *Middletown,* when it is shewn, that they have received the very consideration which they contracted for, the erection of these buildings. The defendants, by the contract, became the debtors of *Lewis ;* and no interest is shewn in any other person, legal or equitable, to prevent this debt from being reached by the creditors of *Lewis,* after he absconded. The plaintiffs, therefore, are entitled to recover.

Several other objections are stated in the motion as having been made to the charge. One only of them, however, was insisted on ;—that the jury were told, the plaintiffs could recover the balance of one tenth of the debts for stone sold, deducting bad debts, whether collected or not ; and it is claimed, that the defendants were rather the attorneys, than the debtors of *Lewis.* *Lewis* leased to them his interest in the quarries, he paying 10 *per cent.* on the sale, bad debts being deducted. *Lewis,* then, parted with his interest. He could not sue for these stone. They were sold, by the defendants, on their own account ; and they were to pay *Lewis,* as the rent, ten *per cent.* of the net avails. The defendants, then, upon the sales,

became indebted ; but the debt was not payable until collected from the sales, or until a reasonable time had elapsed.    Still the debt existed, payable in future, and subject to a deduction arising from bad debts.    If the debts were not due, or a reasonable time for their collection had not intervened, or a deduction ought to be made for bad debts, the defendants might have shewn these facts.    Not having done it, the charge was correct ; and no new trial ought to be granted.

New-Haven,
July, 1835.

Todd
v.
Hall.

In this opinion the other Judges concurred.

New trial not to be granted.